# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

YOLANDA S. BALKNIGHT,

      *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

      *Defendant*.

_____/

CASE NO. 2:15-cv-10341

DISTRICT JUDGE ROBERT H. CLELAND
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Balknight's Motion for Summary Judgment (Doc. 16) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 17) be **GRANTED**.

## II.  REPORT

### A.  Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34 and Supplemental Security Income ("SSI"). (Doc. 5; Tr. at 162-67, 168-74). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 16, 17, 18).

Plaintiff Yolanda Balknight was 39 years old when she protectively applied for benefits on July 25, 2012, alleging that she became disabled on November 15, 2010. (Tr. at 162, 168).

These applications were denied on October 2, 2012. (Tr. at 71, 72). The Commissioner considered peripheral neuropathy and disorders of back, discogenic and degenerative, as possible bases of disability. (*Id.*) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which took place on August 7, 2013, before ALJ Regina Sobrino. (Tr. at 37-70). On December 27, 2013, the ALJ issued a written decision in which she found Plaintiff was not disabled. (Tr. at 14-36). The ALJ's decision became the final decision of the Commissioner on February 12, 2014, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when, after review of additional exhibits,[1] (Tr. at 241, 862), the Appeals Council denied Plaintiff's request for review. (Tr. at 4-8). Plaintiff filed for judicial review of the final decision on January 26, 2015. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

---

[1] In the Sixth Circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.     Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical

3

or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at Step One that Plaintiff met the insured status requirements through September 30, 2012 and that she had not engaged in substantial gainful activity since May 1, 2011, the alleged onset date. (Tr. at 19). At Step Two, the ALJ concluded Plaintiff had the following severe impairments: "degenerative joint disease, degenerative disc disease, peripheral neuropathy, tarsal tunnel syndrome, carpal tunnel syndrome, reflex sympathetic dystrophy, asthma, obesity, diabetes, hypertension, and a mood disorder." (*Id.*). At Step Three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 20-21). The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work

> with the following limitations: the opportunity to alternate position for up to 5 minutes approximately every 30 minutes; no climbing of ladders or stairs; occasional stooping; no kneeling, crouching or crawling; frequent handling, fingering and feeling; no exposure to hazards or vibration; no use of foot or leg controls; no concentrated exposure to fumes, dusts or gases; and no exposure to extremes of temperature or humidity. She is limited to simple, routine, repetitive work, and should be able to wear an[] orthopedic boot while working.

(Tr. at 21-29). At Step Four, the ALJ found that Plaintiff was unable to perform her past relevant work as a babysitter or hair stylist. (Tr. at 29). At Step Five, the ALJ found that a significant number of jobs existed which Plaintiff could perform despite her limitations. (Tr. at 30-31). The ALJ also found that Plaintiff was 38 on the alleged onset date and therefore was a younger individual, age 18-44, as of the alleged onset date. (Tr. at 30). As a result, the ALJ found Plaintiff is not disabled under the Act. (Tr. at 31).

### E.     Administrative Record

As indicated earlier, the relevant evidence is limited to the evidence before the ALJ, and thus, will be limited to evidence predating the hearing date, i.e., August 7, 2013.

Plaintiff was treated at the Flint Neurological Centre (Tr. at 242-51, 483-84, 675-82, 675-82), Hurley Medical Center (Tr. at 252-345, 504-26, 527-49, 550-80), Hamilton Community Health Network (Tr. at 346-454, 455-78, 699-734, 735-77, 778-817, 818-59), McLaren Regional Medical Center (Tr. at 485-89, 490-503, 581-90, 591-600, 635-63, 668-74), Pain Management Center of Flint (Tr. at 601-34), Endocrine Consultants of Mid-Michigan (Tr. at 664-67), Community Podiatry Group (Tr. at 683-87), and Insight Institute of Neurosurgery and Neuroscience (Tr. at 691-94).

EMG studies showed evidence of mild to moderate peripheral neuropathy as early as January 10, 2008, and again on August 20, 2009. (Tr. at 483, 484.)

On October 6, 2010, Plaintiff was treated for upper chest swelling which was tentatively diagnosed as "possible PICC line infection." (Tr. at 341-42.) A right upper extremity venous test was performed and deep vein thrombosis was ruled out as her examination was normal. (Tr. at 344.) On October 8, 2010, Plaintiff was treated for this potential infection of her peripherally inserted central catheter line. (Tr. at 337.)

Plaintiff had noticed a "knot" on the side of her foot and Dr. Daniels stated, on August 11, 2011, that "X-rays show that it is the button from the surgical tightrope." (Tr. at 453.)

Plaintiff participated in a resting study on November 15, 2011, and a stress study on November 17, 2011. (Tr. at 448-49.) All test results were normal. (Tr. at 449.) An echocardiogram taken on November 15, 2011, was normal in all respects except for "[m]ild

concentric left ventricular hypertrophy[,]" "[m]ildly dilated left atrium[,]" "[m]ild tricuspid regurgitation" and "[t]race mitral regurgitation." (Tr. at 451.)

On November 17, 2011, images of Plaintiff's left ankle, in three views, showed "no significant new finding since 8/11/11" noting that the "defect across the distal tibia and fibula is present with small metallic anchoring devices medically and laterally at the end of the defects." (Tr. at 445.) On that same day, Dr. Daniels performed a therapeutic nerve block of the sural nerve on the left foot and increased Plaintiff's dosage of Lyrica. (Tr. at 452.)

On November 28, 2011, an MRI of Plaintiff's left knee showed "mild thinning of the articular cartilage of the medial femoral tibial compartment" and "small joint effusion" but "no meniscal tear identified." (Tr. at 446.) A previous study done in September of 2011 was negative. (Tr. at 447.)

On February 26, 2012, Plaintiff underwent surgery to remove hardware in her left ankle that had been implanted during her previous ankle surgery in 2010. (Tr. at 315-17.)

On May 3, 2012, Dr. Fasial Ahmad, M.D., examined Plaintiff for a neurologic consultation. (Tr. at 247.) Dr. Ahmad found "5/5 strength in upper and lower extremities[,] [n]ormal tone and bulk" but also found "mild hypesthesia to pinprick in the distal lower extremities bilaterally" and  "impairment of vibratory sense at the toes bilaterally." (*Id*.) Dr. Ahmad noted that an EMG "of her lower extremities today demonstrated a mild to moderate peripheral polyneuropathy, but no evidence of lumbar radiculopathy." (*Id*.)

On May 11, 2012, an MRI of the lumbar spine showed the "[c]entral canal is patent at all levels." (Tr. at 631.) It was also noted that "[t]here is neural foramina narrowing moderate

degree…This is multi-factorial" and that "[n]o focal disk herniation identified." (Tr. at 633, 634.)

On May 24, 2012, Dr. Ahmad noted that an EMG of Plaintiff's upper extremities "demonstrated mild carpal tunnel syndrome as well as a right ulnar neuropathy at the elbow" and that an "MRI of the lumbar spine dated May 11 was unremarkable." (Tr. at 243.)

On May 28, 2012, Plaintiff sought treatment for "chronic left ankle pain" in the emergency room at Hurley Medical Center. (Tr. at 265.) All examination findings were normal other than left ankle swelling and Plaintiff was treated with Dilaudid and sent home with Vicodin. (Tr. at 265-66.)

On May 31, 2012, a "Notice of Patient Release/Return to Work" form showed only restrictions to "sit down job." (Tr. at 407.)

Plaintiff presented to the emergency room again on June 14, 2012, for ankle and knee pain. (Tr. at 277.) It was noted that Plaintiff's ankle pain had persisted since an accident in 2010, and that she had been treated by her primary care physician and orthopedic physician "without relief." (Tr. at 278.) Only "slight edema" was found upon examination, and it was noted that the patient and her family were "frustrated" and did not want to "be inconvenienced going to Ann Arbor just to get help" and instead wanted her physician to "prescribe chronic narcotic pain medication[.]" (Tr. at 279.) Dilaudid and Vicodin were prescribed and Plaintiff was sent home. (Tr. at 280.)

On June 21, 2012, Plaintiff was treated at the Hamilton County Clinic because she was "complaining of swelling and shooting pain in her left foot." (Tr. at 409.) Plaintiff was issued an order for a wheel chair by Dr. Keith Daniels, D.P.M., and she was told not to weight bear on

her left foot. (Tr. at 410.) Dr. Daniels noted that Plaintiff "may return to work/school on September 21, 2012." (Tr. at 411.)

On June 26, 2012, Plaintiff again sought treatment in the emergency room for "trouble with cast and rash." (Tr. at 288.) It was noted that she had surgery on her left ankle two years ago and that a "cast was reapplied one week ago to assist with the healing of the ankle and keep the pt off it." (Tr. at 291.) The rash was attributed to insects and Plaintiff was instructed that she should not walk on the cast. (Tr. at 291-92.) Plaintiff returned with the same symptoms on June 28, 2012, she was given Benadryl, steroids, and cream. (Tr. at 304.) It was noted that Dr. Saeed "would not give her anything because he doesn't normally see her. She apparently takes Demerol at home but is currently out." (Tr. at 305.) It was also noted that Plaintiff had a "normal range of motion, sensation of the toes." (*Id*.) Plaintiff "demanded" that the cast be cut off, the doctor "went to obtain the case cutter and upon return, the patient had eloped." (*Id*.)

On July 10, 2012, Dr. Daniels completed a form indicating that Plaintiff could not work her former job or any job for 6 months. (Tr. at 698.)

On July 12, 2012, it was noted that Plaintiff was "wearing a cam walker" and that she "was walking into the clinic without any complaints of pain." (Tr. at 425-26.)

On July 17, 2012, a follow-up exam at the Hamilton County Clinic found Plaintiff's extremities showed "normal alignment and mobility" and noted that she was alert and oriented times three, normal mood and affect, normal attention span and concentration, afebrile and obese. (Tr. at 423-24.)

Plaintiff missed her appointment at the clinic on July 20, 2012. (Tr. at 428.)

9

On August 11, 2012, images of Plaintiff's chest were "negative for active infiltrate" and showed "mild cardiomegaly" with "no significant change since the previous examination of 9/21/2010." (Tr. at 324.)

On August 22, 2012, Dr. Robinson reviewed the "importance of monitoring blood sugar" and the "importance of keeping the blood pressure at or below 130/80" with Plaintiff. (Tr. at 465.)

Plaintiff participated in physical therapy in September and October of 2012. (Tr. at 507-49.) Plaintiff reported lower pain levels in her back and the therapist noted progression with core stabilization. (Tr. at 516.) Plaintiff reported that she "occasionally does hair and has inc[reased] difficulty standing to do hair, LBP with lifting when cleaning, pain with bending for sweeping and mopping floors." (Tr. at 526.) Plaintiff was "discharged from therapy due to non compliance with her attendance[,]" which included "3 cancels and 4 fail to shows[,]" in October 2012.

On October 2, 2012, Plaintiff was examined by Dr. Rama Rao, M.D., who indicated that regarding Plaintiff's continued foot and back pain, "[a]ll options were discussed including not doing anything about it. If the pain is significant and severe, may get benefit from diagnostic and prognostic epidural steroid injections." (Tr. at 733.) Dr. Rao also noted that "Demerol has negative anionotropic action and is easy to develop a tolerance to the medication. I would be cautious with long-term use." (Tr. at 734.)

On October 24, 2012, Dr. Robinson noted that Plaintiff's hypertension was unchanged, her diabetes mellitus was unchanged and her foot pain had deteriorated. (Tr. at 721.) Dr. Robinson also reviewed the importance of monitoring blood sugar and keeping her blood

pressure below 130/80 with Plaintiff. (*Id.*)On November 4, 2012, Dr. Robinson noted that Plaintiff's arthropathy had deteriorated and that her diabetes mellitus was unchanged. (Tr. at 714.) On December 5, 2012, Dr. Robinson noted that Plaintiff's tarsal tunnel syndrome and obesity had deteriorated but also noted that she was alert, oriented times three, had a normal mood, affect, attention span and concentration. (Tr. at 708.)

Plaintiff failed to show for her appointment with Dr. Sripada at the medical clinic on December 20, 2012. (Tr. at 700.)

Plaintiff presented to the emergency room on February 6, 2013, complaining of foot pain with increased swelling, she was given Dilaudid and sent home. (Tr. at 552-69.) Images taken of Plaintiff's left ankle on February 7, 2013, and interpreted by Dr. Singh were "unremarkable" and showed "[n]o acute fracture or dislocation." (Tr. at 570.)

On February 15, 2013, Plaintiff was seen by Dr. Robinson and he noted that Plaintiff "admits to not taking medication as prescribed, not monitoring BP, not following diet recommendations, and not exercising." (Tr. at 766.) Dr. Robinson recommended that Plaintiff "[a]void repetitive activities and modify use of hand and wrist to reduce symptoms" and to "[w]ear the cock-up wrist splint that will be provided until the pain resolves then use nightly for prevention." (Tr. at 768.)

On February 27, 2013, Dr. Robinson completed a form indicating that Plaintiff's conditions were stable and that she would need assistance cooking, cleaning and shopping. (Tr. at 696.)

On March 15, 2013, Dr. Culver examined Plaintiff and found that she was "able to ambulate unassisted, but has an antalgic gait and a prominent left-sided limp." (Tr. at 747.)

11

Plaintiff was measured at 5 feet, 11 inches tall and weighed 296 pounds that day. (Tr. at 746.) Dr. Culver considered "reflex sympathetic dystrophy/complex regional pain syndrome" as a "possibility" but noted that "she lacks many of the overt physical features often found on examination and is not experiencing a burning quality of her pain that is often times true with RSD/CRPS-I." (*Id.*) Dr. Culver recommended caudal epidural injections. (*Id.*)

On March 29, 2013, Plaintiff sought emergency care for back pain and a neurologic examination found "[n]o lower extremity weakness or sensory findings. Normal muscle strength and tone. Reflexes are equal and symmetrical." (Tr. at 585.) In addition, her range of motion was adequate but a "right and left paravertebral spasm" was noted so Plaintiff was given Toradol and morphine, and was sent home with Norflex. (Tr. at 585-86.)

Plaintiff again sought emergency room treatment for back pain on April 2, 2013. (Tr. at 591.) Again her neurological examination was normal and despite a full range of motion in all extremities, an absence of edema, and the fact that her "baseline ambulation status is normal[,]" Plaintiff could not walk without assistance. (Tr. at 593.) Plaintiff was given Dilaudid, Zofran, Norflex and Toradol, and sent home with Flexeril and Vicodin. (Tr. at 594, 597.) A CT scan of Plaintiff's lumbar spine taken that day showed "[r]ight-sided disc protrusions at L4-L5 and L5-S1" and "[m]ild degenerative changes. This leads to mild canal stenosis at L1-L2." (Tr. at 600, 607.)

On April 7, 2013, Plaintiff sought treatment in the emergency room for shortness of breath. (Tr. at 645-63.) A CT scan of the abdomen and pelvis showed "[n]o acute process" and "no enlarged lymph nodes." (Tr. at 638.) An ultrasound of Plaintiff's thyroid taken that day showed a goiter with no thyroid nodule. (Tr. at 640.) Chest x-rays showed "[n]o pulmonary

12

embolism" and "[t]horacic lymphadenopathy." (Tr at 662-63.) Plaintiff was diagnosed with a pulmonary nodule and possible pneumonia and was sent home with medication and in a stable condition. (Tr. at 642.)

During March and April, 2013, Dr. James Culver, M.D. performed several lumbar epidural injection at L4-5. (Tr. at 603-24.)

On April 2, 2013, a CT scan of the lumbar spine showed "[r]ight-sided disc protrusions at L4-L5 and L5-S1" and "[m]ild degenerative changes. This leads to mild canal stenosis at L2-L3." (Tr. at 810.)

On April 8, 2013, a CT scan of the abdomen and pelvis showed "[n]o acute process" and "no enlarged lymph nodes." (Tr. at 793.) An ultrasound of Plaintiff's thyroid taken the same day revealed a "[g]oiter without nodule." (Tr. at 797.) Images of the chest showed "[b]ilateral pulmonary hilar lymphadenopathy" and a "[s]mall right lower lobe pulmonary nodule not seen on radiography." (Tr. at 801.)

On April 23, 2013, Dr. Ahmad noted that Plaintiff would be given "a limited supply of Vicodin 5/500 twenty tablets with no refill, explaining that she is only to receive narcotic analgesic from one prescriber" and that he would be "monitoring" her "closely." (Tr. at 676.)

On April 26, 2013, Dr. Robinson noted the "[n]eed to consider psychologic component to complaints." (Tr. at 784.)

Plaintiff's goiter condition was followed up on May 1, 2013 and Dr. Jamal Hammoud, M.D., concluded that there was "[n]o need for any intervention" and that the same treatment would be continued. (Tr. at 666-67, 856-57.)

On May 22, 2013, Plaintiff was examined by Dr. J. Steven Schultz, M.D., who diagnosed "[c]omplex regional pain syndrome, left ankle" and "[p]robable centralized pain syndrome." (Tr. at 847.) he recommended "a trial of lumbar sympathetic blocks, which would be helpful for both diagnostic and therapeutic purposes." (*Id*.)

On May 29, 2013, a CT of the chest showed "[n]o pulmonary embolism" and that the "visualized thyroid is normal." (Tr. at 669.) In addition, there was "[i]mprovement of thoracic lymphadenopathy" and "the pulmonary nodule is stable[.]" (Tr. at 670.) All other findings were normal. (*Id*.) On May 31, 2013, a CT scan of the chest showed "[i]mprovement of thoracic lymphadenopathy" and that the "5 mm right lobe pulmonary nodule is stable[.]" (Tr. at 840-41, 844.)

On June 7, 2013, Dr. Robinson noted that Plaintiff again "presents with left ankle pain" that she "describes" "as sharp" and that she "has seen several specialists and all modalities have failed to relieve her symptoms." (Tr. at 835.)

On July 29, 2013, Plaintiff was seen by Dr. Robinson and he again noted that Plaintiff "admits to not taking medication as prescribed, not monitoring BP, not following diet recommendations, and not exercising." (Tr. at 822.) Dr. Robinson also repeated warnings that Plaintiff should monitor her blood sugar and keep her blood pressure below 130/80. (Tr. at 825.) On February 15, 2013, Plaintiff was seen by Dr. Robinson and he noted that Plaintiff "admits to not taking medication as prescribed, not monitoring BP, not following diet recommendations, and not exercising." (Tr. at 766.)

On July 30, 2013, Plaintiff was examined by Dr. Prasad Kommareddi, M.D., who assessed that Plaintiff "does have some disability because of her back pains and left foot pains.

14

Her medications need to be reviewed. Her blood pressure could be better controlled." (Tr. at 861.)

On August 6, 2013, an MRI of the lumbar spine showed "degenerative disc disease of the lower lumbar spine most pronounced on the left at the L4-L5 level where there is a left lateral disc herniation[.]" (Tr. at 690.)

The administrative hearing was conducted on August 7, 2013.

On August 9, 2013, Plaintiff was examined by Dr. Sudesh Ebenezer, M.D., who noted that she suffered from "a L4-L5 lateral disc herniation[,]" but advised that "with her significant weight I am very hesitant to proceed with surgical management for this. I have recommended conservative treatment at this point." (Tr. at 693.) Dr. Ebenezer also "advised her that if she were able to lose a significant amount of weight I suspect that much of her symptoms would subside. If she is able to lose a lot of weight and her symptoms have still not subsided we could reconsider surgical management at that time." (*Id.*)

On October 22, 2013, Dr. Robinson filled out a medical needs form wherein he opined that Plaintiff was unable to work at her usual occupation or any job for one year. (Tr. at 862.) Dr. Robinson also indicated that Plaintiff was ambulatory, did not need special transportation, did not need anyone to accompany her to her appointments, but that she needed help shopping, doing laundry, and doing housework. (*Id.*)

In Plaintiff's adult function report, she indicated that she has no problems with personal care, that she can fix a sandwich or heat things in the microwave but cannot fix an entire meal, that she goes to doctor appointments, that she can ride in a car, she drives rarely, someone else

usually shops for her, she can handle her own finances, and that she likes to visit with others. (Tr. at 220-23.)

At the hearing before the ALJ, Plaintiff testified that she is only able to stand for "10, 15 minutes or so" before she needs to sit down, that she can walk for "[p]robably 10 minutes" and that she uses a walker when she goes to stores. (Tr. at 43.) Plaintiff indicated that Dr. Daniels, her podiatrist, prescribed the walker for her in 2010. (Tr. at 43-44.) Plaintiff stated that she has some trouble sitting because she needs to change positions "[l]ike every 10, 15 minutes." (Tr. at 44.) Plaintiff does not lift anything or reach high because to do so causes her back pain. (Tr. at 44-45.)  Plaintiff stated that she does not have any trouble bathing, dressing, or driving but that she does not have a car. (Tr. at 46-47.) Plaintiff denied having any hobbies. (Tr. at 46.) When asked to describe side effects from medication, Plaintiff responded that she "break[s] out from some of them[,]" that she "lost my hair that's why I have to wear a weave[,]" and that "all my medications cause me to be dizzy or drowsy." (Tr. at 47-48.) Plaintiff wore a boot on her left foot to the hearing that she has worn since 2010. (Tr. at 53-54.) In 2012, she had hardware removed from her left ankle. (Tr. at 54.) Plaintiff stated that her foot and back caused her the most problems. (Tr. at 55.) Plaintiff said she elevates her leg "every day" for "[h]ours at a time[,]" for "80 percent" of the day. (Tr. at 56-57.)

The ALJ asked the vocational expert ("VE") to consider an individual with Plaintiff's background who

> is limited to sedentary work as that's how it's defined in the Social Security regulations and the Dictionary of Occupational Titles. The person should not have to climb ladders, ropes, or scaffolds; should not be exposed to hazards or vibration; should not have to use foot or leg controls; there

should be no exposure to extremes of temperature, humidity; there should
be no more than occasional stair climbing or stooping involved.

(Tr. at 64). The VE responded that such an individual could not perform any of Plaintiff's past

relevant work but could perform the 4,408 document preparer jobs, the 3,321 charge-account

clerk jobs, and 812 telephone quotation clerk jobs available in the State of Michigan. (Tr. at

65.) These jobs all had a specific vocational preparation of 2, "that is, unskilled and that

requires up to 30 days for accumulation of knowledge to effectively execute the position." (Tr.

at 66.) None of the jobs involve exposure to pulmonary irritants nor do they require more than

frequent handling, fingering and feeling. (*Id*.) The VE also stated that as long as a person could

remain on-task for ninety percent of the time, the person could change positions for five

minutes every thirty minutes. (Tr. at 67.) In addition, a person could perform such jobs while

wearing an orthopedic boot. (Tr. at 68.)

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.

42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, but the

only relevant distinction for present purposes is between "acceptable medical sources" and

"other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others,

licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources"

include medical sources who are not "acceptable" and almost any other individual able to

provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish

the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and

non-acceptable sources provide evidence to the Commissioner, often in the form of opinions

"about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a

18

treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"), and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL

180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390.

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Plaintiff contends that the ALJ issued an erroneous credibility assessment (Doc. 16 at 14-24), and that the ALJ failed to properly weigh and explain the weight given Dr. Kommareddi's July 30, 2013 opinion and Dr. Robinson's opinion and failed to consider Dr. Culver's opinion. (Doc. 16 at 24-29.)

1.  **Credibility**

As to the ALJ's credibility assessment, Plaintiff argues that the "ALJ selectively reviewed physicians' notes, omitted important opinions and attempted to discredit Plaintiff by suggesting she was malingering and non-compliant." (Doc. 16 at 15.) Plaintiff argues that the ALJ "attempts to portray Plaintiff as a patient who seldom complains of pain, [but] the record itself paints a very different picture." (Doc. 16 at 15-16.) Plaintiff notes that Dr. Robinson indicated that the status of Plaintiff's back pain had deteriorated and that to the extent Plaintiff failed to take pain medication, there is nothing in the record to "indicate she was not taking pain medication because she felt she didn't need it, which is clearly the illusion the ALJ is trying to create in her summary." (Doc. 16 at 16-18.) Plaintiff also argues that Plaintiff would not have been given morphine and other narcotic pain relievers "if Plaintiff had not truly been in excruciating, debilitating pain." (Doc. 16 at 20.) Plaintiff also complains that the ALJ should not have considered Plaintiff's physical therapy record and that the ALJ did not properly consider Plaintiff's obesity, especially as it relates to Dr. Ebenezer's opinion. (Doc. 16 at 23-24.)

The suggestion that Plaintiff may have been malingering and non-compliant was not of the ALJ's creation; rather, it stems from Plaintiff's physicians records. Plaintiff   missed   her appointment at the clinic on July 20, 2012. (Tr. at 428.) Plaintiff was "discharged from therapy due to non- compliance with her attendance[,]" which included "3 cancels and 4 fail to shows[,]" in October 2012. Plaintiff also failed to show for her appointment with Dr. Sripada at the medical clinic on December 20, 2012. (Tr. at 700.) Finally,  Dr.  Robinson  noted  several times that Plaintiff "admits to not taking medication as prescribed, not monitoring BP, not

following diet recommendations, and not exercising." (Tr. at 766, 822.) Dr. Robinson also repeated warnings that Plaintiff should monitor her blood sugar and keep her blood pressure below 130/80. (Tr. at 825.)

Although Plaintiff argues that use of narcotics proves disabling pain, the record actually shows Plaintiff's physicians questioning the validity of such use. Dr. Rao suggested that "[a]ll options were discussed [regarding the treatment of her foot and back pain] including not doing anything about it" and she expressly noted that "Demerol has negative anionotropic action and is easy to develop a tolerance to the medication. I would be cautious with long-term use." (Tr. at 733-34.) Dr. Ahmad similarly cautioned that Plaintiff would be given "a limited supply of Vicodin 5/500 twenty tablets with no refill, explaining that she is only to receive narcotic analgesic from one prescriber" and that he would be "monitoring" her "closely." (Tr. at 676.) An ALJ may assess, under credibility, whether the use of narcotic pain medication is based on the plaintiff's subjective desire for the medication rather than due to disabling symptoms. *See Castle v. Colvin*, No. 2:14-cv-877, 2015 WL 2383493, at *3 (S.D. Ohio May 19, 2015). In addition, to the extent Plaintiff contends it was error for the ALJ to consider times when Plaintiff did not take such medication, this too is not error. *See Smith v. Colvin*, 756 F.3d 621, 626 (8th Cir. 2014) (no error in ALJ finding claimant not credible, including that claimant did not take narcotic medications for pain relief). I therefore suggest that this ground does not undermine the ALJ's findings.

As to malingering, it was Dr. Robinson who noted the "[n]eed to consider psychologic component to complaints." (Tr. at 784.) And he also carefully noted that Plaintiff again

"presents with left ankle pain" that she "describes" "as sharp" and that she "has seen several specialists and all modalities have failed to relieve her symptoms." (Tr. at 835.)

I suggest that the ALJ did not err in noticing what Plaintiff's physicians and therapists stated as to the above credibility issues.

Finally, as to obesity, SSR 02-1p "does not mandate a particular mode of analysis, but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (citation omitted). In this case, the ALJ expressly considered all of Plaintiff's impairments, severe and non-severe, and I therefore suggest that SSR 02-1p was satisfied.

Considering all of Plaintiff's impairments, the modest treatment Plaintiff received also supports the ALJ's findings since such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007). I therefore suggest that substantial evidence supports the ALJ's credibility finding that none of Plaintiff's impairments, alone or in combination, could reasonably be expected to cause the alleged disabling symptoms.

## 2. Medical Source Opinions

Plaintiff contends that the ALJ failed to properly weigh and explain the weight given Dr. Kommareddi's July 30, 2013 opinion and Dr. Robinson's opinion and failed to consider Dr. Culver's opinion. (Doc. 16 at 24-29.)

Unfortunately for Plaintiff, these opinions, even if fully adopted, do not support a finding of disability. Dr. Ahmad found "5/5 strength in upper and lower extremities[,]" and that an EMG "of her lower extremities today demonstrated a mild to moderate peripheral polyneuropathy, but no evidence of lumbar radiculopathy." (Tr. at 247.) Dr. Ahmad also noted that an EMG of Plaintiff's upper extremities "demonstrated mild carpal tunnel syndrome as well as a right ulnar neuropathy at the elbow" and that an "MRI of the lumbar spine dated May 11 was unremarkable." (Tr. at 243.) Dr. Robinson admonished Plaintiff about taking her medications, losing weight, and monitoring her blood sugar and blood pressure levels as discussed under the credibility analysis. (Tr. at 766, 822, 825, 835.) Dr. Culver's opinion was that Plaintiff was "able to ambulate unassisted, but has an antalgic gait and a prominent left-sided limp." (Tr. at 747.) Dr. Culver considered "reflex sympathetic dystrophy/complex regional pain syndrome" as a "possibility" but noted that "she lacks many of the overt physical features often found on examination" and recommended and performed epidural injections. (Tr. at 603-24, 747.) Dr. Kommareddi assessed that Plaintiff "does have some disability because of her back pains and left foot pains. Her medications need to be reviewed. Her blood pressure could be better controlled." (Tr. at 861.) His characterization of her condition as "some disability" is akin to "some impairment" and it is based fully on Plaintiff's subjective complaints of pain and therefore could properly be discounted. *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's

25

treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

Furthermore, Plaintiff's physicians generally only restricted her to a "sit down job" or limited her ability to work for a period of months far less than a year. (Tr. at 407, 411, 698.) Dr. Robinson opined that Plaintiff was unable to work at her usual occupation or any job for one year. (Tr. at 862.) However, that conclusion is not entitled to deference because it encroaches on a matter reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2.

Finally, although Plaintiff spins Dr. Ebenezer's opinion to conclude that surgery would be "too risky" based on Plaintiff's obesity (Doc. 16 at 23,) Dr. Ebenezer actually stated that "if she were able to lose a significant amount of weight I suspect that much of her symptoms would subside."(Tr. at 693.)

I therefore suggest that none of Plaintiff's physicians opinions support a finding of disability and that any failure of the ALJ to adequately explain the weight given their opinions would be mere harmless error. *Cole v. Comm'r of Soc. Sec.*, 652 F.3d 653, 661 (6th Cir. 2011)

### G.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (Doc. 16) be **DENIED**, the Commissioner's Motion (Doc. 17) be **GRANTED**, and that this case be **AFFIRMED**.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file

specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 23, 2015    S/ PATRICIA T. MORRIS
             Patricia T. Morris
             United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: October 23, 2015                          By s/Kristen Krawczyk
                                                Case Manager to Magistrate Judge Morris